**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAUREN ALEXIS COSTAS,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 4:25-CV-2582<br><br>JUDGE JOHN R. ADAMS<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>JENNIFER DOWDELL ARMSTRONG<br><br>**REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

The Commissioner of Social Security denied Plaintiff Lauren Alexis Costas's application for a period of disability, Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Ms. Costas seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Nov. 25, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II. PROCEDURAL HISTORY

In December 2023 and January 2024, respectively, Ms. Costas applied to the Social Security Administration (SSA) seeking a period of disability and DIB benefits, then SSI benefits. (Tr. 248, 250.)[1] She claimed that she became disabled on December 31, 2016. (Tr. 248, 250.) She identified ten allegedly disabling conditions: (1) "lumbar injury"; (2) kidney failure; (3) "sciatic

[1] The administrative transcript appears at ECF No. 5. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 30"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 6") and page-identification numbers (e.g., "PageID# 1116").

nerve damage"; (4) "cervical bulging disc"; (5) "degenerative disc"; (6) depression; (7) anxiety; (8) post-traumatic stress disorder; (9) "numbness from knee to toe in left leg"; and (10) "unable to walk/stand/sit longer than 30 minutes." (Tr. 280.)

The SSA denied Ms. Costas's application initially and upon reconsideration. (Tr. 79, 80, 92, 104, 105, 106.) Ms. Costas requested a hearing before an administrative law judge (ALJ). (Tr. 147.) The ALJ held a hearing on March 20, 2025, at which Ms. Costas was represented by counsel. (Tr. 37–78.) Ms. Costas testified, as did an independent vocational expert (VE). (*Id.*)

On March 28, 2025, the ALJ issued a written decision finding that Ms. Costas was not disabled. (Tr. 14–31.) Ms. Costas requested review of the ALJ's decision. (Tr. 242–43; *see also* Tr. 349–50.)

On September 30, 2025, the Appeals Council denied review. (Tr. 1.)

On November 25, 2025, Ms. Costas filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Costas asserts the following assignments of error for review:

> **First Assignment of Error:** Remand is required for the ALJ's failure to reconcile the opinion of the consultative examiner with the RFC after finding it persuasive.
>
> **Second Assignment of Error:** Remand is required for the ALJ's errors evaluating the opinion of Plaintiff's psychiatric nurse practitioner.

(Pl.'s Merit Br. at 15, 18, ECF No. 6, PageID# 1116, 1119.)

## III. BACKGROUND[2]

### A. Personal, Educational, and Vocational Experience

Ms. Costas was born in August 1985 and was 38 years old on the date of her application. (Tr. 248.) She graduated from high school and then earned an associate's degree in nursing. (Tr. 46–47; 281.) She tried working as a nurse, and she worked less than three months before learning of her post-surgical limitations for standing, walking, and lifting. (Tr. 47.) She also has some experience working intermittently in retail sales for telecommunications cellular service companies between 2008 and 2017. (Tr. 48–49, 281–82.) She last worked in 2017. (Tr. 47, 281.)

Ms. Costas is divorced and lives alone; she had been living alone for three or four years at the time of her hearing. (Tr. 45–46.) She has an adult child. (Tr. 48.) She has a driver's license. (Tr. 45.) She has a pet cat. (Tr. 46.) She receives Medicaid, and her parents own the house in which she lives, help pay bills, and buy groceries. (Tr. 46–48.)

### B. Function Reports

On January 28, 2024, Ms. Costas filled out a function report in support of her disability application. (Tr. 297.) On a typical day, she wakes up, makes coffee, takes a shower, reads a morning "devotion," meditates, does as much of her physical therapy exercises as she can, and participates in online schooling. (Tr. 291.) She is able to care for pets and has no trouble seeing to her own personal care. (*Id.*) She has sleep disturbances related to stress and physical pain. (*Id.*) She can prepare easy meals and snacks, and she prepares food daily or a few times a week. (Tr. 292.) But sometimes she is not able to stand long enough to prepare meals. (*Id.*) She is able to do laundry, but she cannot lift a full basket of clothes. (*Id.*) She dusts, sweeps, loads the dishwasher,

---

[2] Ms. Costas's assignments of error raise issues related solely to her mental health impairments and related limitations. Thus, although I have reviewed the entire record, I focus my summary on the evidence related to Ms. Costas's mental health impairments and related limitations.

and does other basic cleaning and tidying. (*Id.*) She is able to drive, but she no longer has a working car; she gets outside "very rarely." (Tr. 293.) She shops online about once a week for food and toiletries. (*Id.*) She is able to handle finances and pay bills. (*Id.*)

Ms. Costas enjoys watching television, reading, scrapbooking, journaling, and playing with her pets. (Tr. 294.) But she is now unable to walk her dog or lift the animal into the bathtub. (*Id.*) She socializes daily with others, mostly on the phone or through text messaging. (*Id.*) She attends church, group therapy, and "advocacy groups" online. (*Id.*)

Ms. Costas wrote that it takes "great effort" to pay attention for "new things" and reading. (Tr. 295.) But for the most part, she finishes what she starts. (*Id.*) She follows written and spoken instructions well. (*Id.*) She gets along well with authority figures. (*Id.*) She has recently been having a hard time regulating her stress and anxiety. (Tr. 296.) She does not handle changes in routine well. (*Id.*) She has a fear of socialization and leaving the house. (*Id.*)

In January 2024, Ms. Costas reported that she could not bend, squat, twist, or lift more than 25 pounds and has difficulty getting up from chairs. (Tr. 288.) She said her arms or hands "go numb and begin tingling" after physical movement. (*Id.*) She said she has not regained full functionality of the left leg, reporting numbness and constant discomfort from the knee to the toes, such that she has no sensation in the toes. (*Id.*)

### C. <u>Relevant Hearing Testimony</u>

#### *1. Ms. Costas's Testimony*

Ms. Costas testified that she left her job as a telecommunications sales representative due to "chronic pain and the sensory impairment on [her] left side." (Tr. 49.) She found that she was not able to stand or walk for longer than 30 minutes, and the job required her to be on her feet for most of the day. (*Id.*; *see also* Tr. 62–63.)

Before voluntarily leaving her job, she had undergone back surgery in 2015. (*See* Tr. 50.) She has an extra lumbar vertebra around the L4–S1 levels. (Tr. 63.) After her surgery, she found that she was having pain in her lower back with sciatica radiating down her left leg all the way to her toes. (Tr. 50.) She does not have much sensation in her left leg. (*Id.*) It was painful to walk, sit, or stand for too long. (*Id.*) Beginning in 2017, she was unable to stand on her feet for longer than 30 minutes and indeed could not be in any position for longer than a half hour due to discomfort and pain. (Tr. 51.) After a half hour, Ms. Costas would lie down with her feet elevated, but she often could not find a position that was comfortable. (*Id.*)

Ms. Costas said that her average pain level is a five on a scale of one to ten. (*Id.*) But her pain is inconsistent; sometimes she has days where she does not have much pain, but she is in significant pain on other days. (*See* Tr. 51–52.) Aggravating factors include the weather and increased activity. (*See id.*)

Sitting in an office chair is more uncomfortable for her than any other position, leading to pain from the lumbar area to the sacrum. (Tr. 52.) She finds that she has to put most of her weight on the right side, and even then she can sit for no longer than 20 minutes. (*Id.*) After that, she finds that she has to lie down for at least an hour. (Tr. 52–53.)

Ms. Costas had been recommended and prescribed medication, most recently gabapentin, for pain. (Tr. 53.) But she is currently not taking any medication, which she attributed to cost and difficulty getting in to see her doctor, due to the doctor's busy schedule and the fact that her car is not working. (Tr. 53–54.)

Ms. Costas sees to her household chores, like laundry, but she does so "with great difficulty" and in segments. (Tr. 54.) She does light loads of laundry, "just a couple of shirts and pants and maybe a towel" at a time. (Tr. 55.) She has trouble navigating the stairs in her home due

to swelling in her legs and the lack of sensation in her left foot and ankle. (*Id.*) There are some days, which are occurring "[p]retty often as of lately" where she does not feel well enough to even go get her laundry from the dryer. (*Id.*)

Ms. Costas orders her groceries and has them delivered; the delivery people will carry her groceries inside the home for her. (Tr. 56.) She prepares her own meals, but she only cooks microwavable meals. (*Id.*) She has trouble bending, and she has difficulty bathing, showering, and using the restroom due to her physical conditions. (Tr. 56–58.) She underwent injections years ago and plans to return to a doctor for follow up treatment when she is able to arrange transportation. (Tr. 65.) She takes acetaminophen and ibuprofen, but they do not seem to help much. (Tr. 66.) Around three days per week, she is in so much pain that she has to lie down all day. (*Id.*)

With respect to her mental health, Ms. Costas takes amphetamine/dextroamphetamine (Adderall), bupropion (Wellbutrin), and vortioxetine (Trintellix) routinely. (Tr. 58.) She also takes alprazolam (Xanax) as needed for acute episodes of anxiety. (*Id.*)

She testified that she is having a "rough time" with her mental health lately, and she finds herself worrying about money and not being able to care for herself. (*Id.*) She has acute anxiety episodes at least four days a week. (Tr. 58–59.) The Xanax helps her to sleep, which stops the anxiety attack but causes her to need to sleep for two or three hours. (Tr. 59.) She has anxiety when her phone rings, because she fears it will be bad news, and she does not like being in public so she does not go out very often. (Tr. 59–60.)

The Adderall helps her to focus, but as her mental health gets worse she is finding that "intrusive thoughts" are "coming through the medication." (Tr. 60–61.) These thoughts make it hard for her to focus, cause her stress, and make her fatigued. (Tr. 61.) She finds that she does not finish things that she starts, "even the simplest things." (Tr. 62.)

Three years before the hearing, Ms. Costas was caring for a teenage sister, but the sister was largely independent except for needing a ride to school. (Tr. 64.)

Ms. Costas testified that she finds it difficult to stay organized with respect to her health treatment. (Tr. 67–68.)

#### *2. Vocational Expert's Testimony*

Lynn Smith testified as a vocational expert (VE) at the hearing. (Tr. 68.) She classified Ms. Costas's past relevant work as that of a sales clerk (DOT 253.257-010). (Tr. 69.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Costas's age, education, and work experience had the capacity to perform work at the light exertional level, with additional limitations. Specifically, the person could frequently balance and occasionally climb ramps and stairs. (*Id.*) They can occasionally stoop, kneel, crouch, and crawl. (*Id.*) They must never climb ladders, ropes, or scaffolds. (*Id.*) They cannot work around unprotected heights, dangerous moving machinery, or open bodies of water. (*Id.*) They cannot perform work requiring a fast production rate pace (like on an assemble line). (*Id.*) They can deal with occasional changes in a routine work setting. (*Id.*)

The VE testified that Ms. Costas could perform her past relevant work and could further perform work as a deli clerk, cashier, or price marker. (Tr. 70–71.)

The ALJ next asked the VE to assume that the hypothetical person was further limited in that they can stand or walk for four hours and sit for four hours in a normal workday. (Tr. 71.)

The VE testified that such a person could not perform Ms. Costas's past relevant work, but the VE said that such a person could still perform the work of a phone quotation clerk, ticket checker, or order clerk. (*Id.*)

In the third hypothetical question, the ALJ asked the VE to assume that a person with Ms. Costas's age, education, and work experience could lift up to 10 pounds occasionally, and frequently lift objects weighing less than 10 pounds. (Tr. 72.) They can stand or walk for four hours and sit for four hours in an eight-hour workday. (*Id.*) They can frequently balance. They can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (*Id.*) They must never climb ladders, ropes, or scaffolds. (*Id.*) They must avoid unprotected heights, dangerous moving machinery, and open bodies of water. (*Id.*) They cannot engage in commercial driving. (*Id.*) They cannot perform work requiring a fast production rate pace (like on an assembly line) or work requiring hourly quotas. (*Id.*) They can deal with up to occasional changes in a routine work setting. (*Id.*)

The VE testified that the previous three jobs she identified would remain for such an individual. (*Id.*)

The ALJ then asked the VE to assume that the hypothetical person would need an additional 15 minute unscheduled break, beyond the normal two 15 minute breaks and a lunch break. (*Id.*) The VE testified that such a break would be allowed by employers. (Tr. 73.)

The VE further testified that employers tolerate employees who are off task for up to 10 percent of the workday. (*Id.*) The VE counted the unscheduled break toward that percentage. (*Id.*) Employers tolerate up to one absence per month, no more. (*Id.*)

Ms. Costas's counsel asked the VE to assume that the person from the ALJ's first hypothetical question was further limited to having only occasional interactions with supervisors, coworkers, and the general public. (Tr. 74.)

The VE testified that such a person could not be a deli clerk or cashier, but could perform the work of a price marker, cleaner, or routing clerk. (Tr. 74–75.) Those three jobs would remain even if the person needed a sit/stand option to alternate positions every 30 minutes. (Tr. 75–76.)

**D. <u>State Agency Consultants</u>**

A disability examiner (Randall Hicks), a physician (King Leong, M.D.), and a psychologist (Michelle Hoy-Watkins, Psy.D.) reviewed Ms. Costas's claim at the initial review level in July 2024. (Tr. 79–104.)

Dr. Hoy-Watkins opined that Ms. Costas has moderate limitations in her ability to concentrate, persist, or maintain pace, and to adapt or manage herself. (Tr. 85.) She found Ms. Costas's subjective statements to be partially consistent with the record evidence, and she found that the treating source's mental evaluation report was persuasive "as it provides documentation of . . . severe symptoms, treatment history, and a recent [mental status examination.]" (Tr. 86.)

While Dr. Hoy-Watkins opined that Ms. Costas had a moderate impairment in her ability to maintain attention and concentration for extended periods, the doctor concluded that Ms. Costas was "capable of simple and more complex tasks without fast pace or high production quotas." (Tr. 90.) And while Ms. Costas had a moderate limitation in her ability to respond appropriately to changes in the work setting, she was capable of adapting to "infrequent changes in the work setting." (*Id.*) Dr. Hoy-Watkins further explained that Ms. Costas "retains the ability to understand, remember and follow simple instructions," "can adapt to predictable changes and work-related stressors," and "can engage in appropriate social interactions in a work environment." (Tr. 90.)

Based in part on this opinion, the consultants concluded that Ms. Costas could perform the work of a charge account clerk, election clerk, or bill sorter and was not disabled. (Tr. 91–92.)

In a letter to Ms. Costas explaining this decision, the Agency wrote that the records showed that she "retain[ed] the ability to perform work that is of a light strength but limited to never climbing heights and should be without fast pace or high production quotas." (Tr. 139.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Michael Spalla), a physician (Geral Klyop), and a psychologist (Audrey Todd, Ph.D.) in August 2024. (Tr. 105–26.)

Dr. Todd found that the initial administrative medical findings and the mental residual functional capacity determinations were consistent and supported by the objective evidence in file. (Tr. 110.)

Based on these opinions, the consultants agreed with the initial level findings that work was available to Ms. Costas and that she was not disabled. (Tr. 115–16.)

**E. <u>Relevant Medical Evidence</u>**

Ms. Costas presented to the emergency department on December 29, 2016, requesting a refill of her Xanax and Adderall prescriptions. (Tr. 689.) She said she had persistent, mild symptoms and was "normal" on medication, but she had run out of medication for a couple days and was having difficulty establishing care with her regular or a new psychiatry practice. (*Id.*)

Ms. Costas presented to the emergency department again three years later, on September 11, 2019. (Tr. 635.) She reported that a family dispute had exacerbated her "moderate" consistent depression and anxiety, but she said she had an appointment with her psychiatrist tomorrow. (*Id.*) Her sister had called for emergency services after Ms. Costas said something that Ms. Costas said was misinterpreted as a statement of suicidal intent. (*See id.*; *see also* Tr. 639.) She was admitted to the hospital, where she responded well to medication and therapy and was ultimately discharged on September 14, 2019. (Tr. 421.) Upon discharge, she had no major depression or anxiety. (*Id.*)

Ms. Costas established care with a medication management practice, seeing Lauren Miller (PMHNP-BC), on June 21, 2021. (Tr. 483.) Ms. Costas said that her previous practitioner was no longer practicing, and she was looking to continue with the medications that "she has been managed with effectively for years." (*Id.*) She reported that she had been treated for hyperactive and attention difficulties that manifest at home and at work. (*Id.*) She described "careless mistakes" and "difficulty sustaining attention." (*Id.*) Her medication was noted to be "very effective." (Tr. 487.) On examination, Ms. Costas was calm, friendly, attentive, and communicative, with normal mood. (Tr. 489.) She was continued on her long-term medication. (*Id.*)

Ms. Costas established care with Lauren Carsten, LPCC, on July 8, 2021. (Tr. 492.) She described having depression, anxiety, and ADHD. (*Id.*) She said her depressive symptoms had been present since her teenage years, and she described worsening symptoms as an adult from navigating significant family stressors, including divorces and child custody disputes. (*Id.*) On examination, Ms. Costas showed no gross abnormalities with respect to her mental status, and the counseling session focused on coping strategies. (Tr. 499.)

Ms. Costas met with Ms. Miller again on July 21, 2021. (Tr. 502.) Ms. Costas said she was "okay" and described grief after the death of a young family friend. (*Id.*) She said her medications were working well, and while she had continued anxiety symptoms, they were lessened in frequency and intensity. (*Id.*) On examination, Ms. Costas was euthymic with no gross mental abnormalities noted. (Tr. 503.)

Ms. Costas reported that she was "doing well" again in August 2021. (Tr. 506.) She was "okay" in September, October, and November 2021. (Tr. 510, 514, 518.) In December 2021, she again reported that she was okay, that her medication was working well, and that no changes were needed. (Tr. 522.)

In January 2022, Ms. Costas reported some additional depressive symptoms, including sadness, difficulty thinking, fatigue, crying spells, and low energy. (Tr. 526.) Her examination was largely unchanged, and she was started on Wellbutrin. (Tr. 527, 529.) By February 2022, she reported that her medication was working well and her depressive symptoms were improving. (Tr. 530.) In March 2022, she said the Wellbutrin had been "very effective" in improving her symptoms. (Tr. 534, 538.) She followed up in April, May, June, and July 2022, with relatively stable symptoms. (Tr. 543, 547 (anxiety was increased due to family stress), 552, 557 (no anxiety reported)).

At her appointment with Ms. Miller in August 2022, Ms. Costas reported anxiety symptoms and specifically described that she had daily anxiety that was difficult to control, pointing to "harassment from [an] ex husband." (Tr. 561.) She described symptoms of post-traumatic stress disorder as a result of that situation. (Tr. 562.)

Several days later, Ms. Costas had an initial evaluation with a community services agency. (Tr. 467.) She again reported domestic violence and emotional abuse by her ex-husband. (*Id.*) Her mental status examination was normal, with above average intelligence noted. (Tr. 469–70.)

Ms. Costas followed up with Ms. Miller in September 2022. (Tr. 573.) Ms. Costas described her anxiety and depression as "episodic but manageable." (*Id.*)

In October 2022, Ms. Costas said that she had been "feeling more bluesy." (Tr. 578.) Her mental status examination was largely unchanged. (Tr. 579.) Her Wellbutrin dosage was increased. (Tr. 581.)

She reported that her medication was effective, with no changes needed, at visits in November and December 2022. (Tr. 583, 588, 593 ("depression has improved since increase in Wellbutrin").

At her visit with Ms. Miller in January 2023, Ms. Costas said that she was "actually doing very good," although she continued to have occasional episodes of generalized anxiety disorder. (Tr. 599.) She was continuing to sleep well, her anger was well controlled, and she was able to see to her self care with intact "domestic skills." (*Id.*) She had no medication changes, with stable symptoms, in February and March 2023. (Tr. 605, 611.) In May 2023, she said she was "doing well" and there was no increase in her depression symptoms. (Tr. 997.) Her medication was managing her anxiety symptoms. (*Id.*) Her ADHD symptoms were well controlled. (*Id.*) There were no changes in June 2022. (Tr. 1002.)

Ms. Costas followed up with Renee McMancus (DNP, PMHNP-BC, ACNS-BC), in April 2023. (Tr. 922.)She reported that she was stable with respect to her depression and anxiety, with manageable symptoms. (*Id.*)

Ms. Costas underwent a consultative psychological examination with Jennifer Haaga, Psy.D., on May 29, 2024. (Tr. 927.) She described significant family stressors, including a custody dispute regarding her children and a history of domestic violence. (Tr. 928.) She described that she stopped working due to her physical impairments; she has never been fired from a job and has no history of interpersonal problems at work. (Tr. 929.) On examination, Ms. Costas was dressed appropriately and was cooperative, although she maintained only "fleeting" eye contact. (Tr. 930.) She described variable appetite, significant anxiety, nightmares, and a "pretty depressed" mood. (*Id.*) On cognitive testing, Ms. Costas seemingly performed well, although she could not say on which continent Brazil was located. (Tr. 931.) Dr. Haaga assessed that Ms. Costas's cognitive functioning was in the average range of ability. (*Id.*) Her attention and concentration was adequate, too, and her ability to abstract was adequate. (*Id.*) Although Ms. Costas reported some difficulties with recent memory functioning, she demonstrated no difficulties during the evaluation. (*Id.*)

Dr. Haaga opined that Ms. Costas was capable of " comprehending and completing simple routine tasks as well as more complex tasks." (Tr. 933.) Ms. Costas indicated that her persistence and pace were mainly limited by physical issues, but Dr. Haaga wrote that "her symptoms of depression and anxiety will likely cause difficulties" in the area of maintaining attention, concentration, persistence, and pace. (*Id.*) Dr. Haaga wrote that that her impairments "will exacerbate those difficulties that she does have," making "many tasks significantly more difficult" when "the demands become too great." (*Id.*) Dr. Haaga said that Ms. Costas could be expected to be frequently ruminating or worrying "about situations or about her daughter." (*Id.*) Dr. Haaga noted that Ms. Costas had no trouble with social interaction but "presented as depressed and distressed and would likely struggle to consistently and successfully respond to work pressures." (Tr. 933–34.) She is "likely [to] leave or avoid jobs." (Tr. 934.)

Ms. Costas treated with a therapy center for three appointments from May 2024 to July 2024, with a diagnosis of PTSD; a psychologist noted that the doctor was not able to capture all the information necessary to opine on Ms. Costas's ability to do work activities, due to the limited number of appointments. (Tr. 946, 961.) Ms. Costas had stopped showing up to appointments and was not responding to communications from the practice to reschedule, so she was ultimately discharged in September 2024. (Tr. 965.)

Ms. Costas followed up with Lauren Treharn (PMHNP-BC) in November 2024. (Tr. 1026.) Her anxiety was improved, and an increased dosage of Xanax was "very helpful" in lessening anxiety symptoms. (*Id.*) She said that she was having panic attacks a few times a month, with symptoms including palpitations, trembling, and shaking. (*Id.*) Her depressive symptoms were increasing, with symptoms including fatigue, worrying, and anxiety. (Tr. 1027.) On examination, Ms. Costas was "sad looking" but was communicative with coherent and spontaneous speech and

articulation. (Tr. 1028.) Her dosage of Trintellix was increased, with the thought that it could be reduced in the spring. (Tr. 1030.)

By December 2024, her anxiety symptoms were decreasing, with no recent panic attacks reported. (Tr. 1033.) Her depressive symptoms were present, but episodically. (*Id.*) Her medication was not changed. (Tr. 1038.) Her mental status examination was largely normal. (Tr. 1035.)

At an appointment in January 2025, Ms. Costas said that she was experiencing anxiety "more days than not," but she said the panic attacks had stopped. (Tr. 1040.) Her depressive symptoms were described as chronic. (*Id.*) Her symptoms were largely unchanged in February 2025. (Tr. 1048.)

Ms. Treharn completed a medical source statement in support of Ms. Costas's disability application in March 2025. (Tr. 977.) Ms. Treharn noted that she had treated Ms. Costas monthly since June 2021. (*Id.*) Ms. Costas was stable on medication, although that medication may have side effects. (*Id.*) Ms. Costas had been socially avoidant and had presented with a depressed mood, poor concentration, sleep disturbances, anxiousness, inattentiveness, and restlessness, and she had a history of panic attacks. (*Id.*) But she was stable as long as she continued treatment. (*Id.*)

In a checkbox form, Ms. Treharn noted signs and symptoms including decreased energy, persistent anxiety, persistent disturbances in mood and affect, distractibility, and sleep disturbance. (*See* Tr. 978–80.) On the same form, she opined that most of Ms. Costas's impairments would preclude work for up to 20 percent of the workday. (*See id.*) Ms. Treharn checked off that that Ms. Costas would be off task for 15 percent of the workday and would be absent about four days per month. (Tr. 980–81.)

## IV. THE ALJ'S DECISION

The ALJ determined that Ms. Costas met the insured status requirements of the Social Security Act until March 31, 2020. (Tr. 19.) The ALJ next determined that Ms. Costas had not

engaged in substantial gainful activity since December 31, 2016, the alleged onset date. (*Id.*)

The ALJ next determined that Ms. Costas had severe impairments of (1) adult attention-deficit/hyperactivity disorder; (2) depression; (3) anxiety; (4) post-traumatic stress disorder; (5) status post lumbar laminectomy and discectomy; and (6) lumbar degenerative disc disease with spondylosis, disc herniation, and stenosis at L4–5 and moderate neuroforaminal encroachment at L4–5. (Tr. 20.)

The ALJ further found non-severe impairments of headaches and status post kidney stone. (*Id.*) The ALJ stated that she considered all of Ms. Costas's impairments, including those found non-severe, when developing the residual functional capacity. (*Id.*)

The ALJ next determined that none of Ms. Costas's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Ms. Costas had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 21–22.) Specifically, Ms. Costas can stand for four hours and sit for four hours in an eight-hour workday. (Tr. 21.) She can frequently balance. (*Id.*) She can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, but she should never climb ladders, ropes or scaffolds. (*Id.*) She can never work around unprotected heights, moving machinery, or open bodies of water. (Tr. 21–22.) She can perform no work requiring a fast production pace, like assembly line work, or work requiring hourly quotas. (Tr. 22.) She can deal with occasional changes in a routine work setting. (*Id.*)

The ALJ's decision is inconsistent when it comes to past relevant work; she found that Ms. Costas has past relevant work as a sales clerk, but she also wrote that transferability of job skills

was not an issue because Ms. Costas has no past relevant work. (*See* Tr. 29.) The ALJ found that Ms. Costas was 31 years old on the alleged disability date and had at least a high school education. (*Id.*)

The ALJ then determined that—considering Ms. Costas's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a phone quotation clerk (DOT 237.367-046), ticket checker (DOT 219.587-010), and order clerk (DOT 209.567-014). (Tr. 30.)

Accordingly, the ALJ determined that Ms. Costas is not disabled. (Tr. 30–31.)

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C. Analysis**

Ms. Costas raises two assignments of error in this appeal, which I address in turn.

***1. Dr. Haaga's Opinion***

In her first assignment of error, Ms. Costas asserts that remand is required because the ALJ allegedly failed to reconcile the opinion of Dr. Haaga with the RFC, after finding it persuasive.

The ALJ discussed Dr. Haaga's opinion as follows:

> [Ms. Costas during the examination] reported good relationships with two siblings and her children, and okay relationships with family. She continued to struggle with custody issues and reported domestic violence in her marriage prior to divorce. . . . She felt her psychiatric medications helped and she noticed it if she stopped them. She reported that she applied to go back to school online and did Zoom meeting[s]. She does chores in shifts due to not being able to be on her feet long. She could not always do laundry by herself and cook dinner but vacuuming puts her down. She managed her finances and can drive but her car is not working. She maintained fleeting eye contact and was cooperative. Her grooming and hygiene were adequate and her interaction was adequate although her mood appeared depressed. However, she denied suicidal ideation. Dr. Haaga diagnosed the claimant with Persistent Depressive Disorder, early onset, with intermittent major depressive episodes with current episode, with anxious distress, moderate, and Other Specified Trauma and Stressor Related Disorder, some symptoms of PTSD and adjustment disorder, with panic attacks. She opined that the claimant is capable of comprehending and completing simple routine tasks as well as more complex tasks. In maintaining attention and concentration, persistent and pace, Dr. Haaga opined that when demands become too great, the claimant would have significant difficulty with attention and concentration, noting that the claimant reported she manages symptoms of depression and anxiety and ruminating or worrying about situations or about her daughter. She indicated her persistence and pace are mainly limited by medical issues. As for responding appropriately to supervision and coworkers, she had no history of interpersonal problems with supervisors,

> coworkers or customers but is nervous and avoidant around others due to her experiences. In responding to work pressures, Dr. Haaga opined that the claimant presented as depressed and distressed and would likely struggle to consistently and successfully respond to work pressures. She is not likely to demonstrate problematic externalizing behaviors but would likely leave or avoid jobs. . . .
>
> . . .
>
> The undersigned finds Dr. Haaga's opinion persuasive and supported by her evaluation of the claimant and observations of her demeanor and reported symptoms. Moreover, her opinion is consistent with the claimant's report of anxiety and depression while undergoing treatment . . . and treatment provided by Kearisten Gaines, PsyD, noting she presented with symptoms of PTSD, including nightmares, intrusive and unwanted memories, depressive symptoms, isolation and avoidance of thoughts and low mood. . . . .

(Tr. 26, 28) (internal citations to the record omitted).

Ms. Costas takes issue with this analysis, pointing out that Dr. Haaga wrote that "her symptoms of depression and anxiety will likely cause difficulties" in the area of maintaining attention, concentration, persistence, and pace. (*Id.*) Dr. Haaga wrote that that her impairments "will exacerbate those difficulties that she does have," making "many tasks significantly more difficult" when "the demands become too great." (*Id.*) Dr. Haaga said that Ms. Costas could be expected to be frequently ruminating or worrying "about situations or about her daughter." (*Id.*) Dr. Haaga noted that Ms. Costas had no trouble with social interaction but "presented as depressed and distressed and would likely struggle to consistently and successfully respond to work pressures." (Tr. 933–34.) She is "likely [to] leave or avoid jobs." (Tr. 934.) Ms. Costas contends that the ALJ did not include any of these alleged restrictions in the RFC.

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20

C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

The Commissioner defends the ALJ's decision, arguing that the RFC adequately accounts for the opined moderate limitation with respect to Ms. Costas's ability to concentrate and maintain attention and pace, as the RFC limits her to work that does not require fast-paced work or work requiring hourly quotas. The Commissioner further argues that Dr. Haaga's opinion largely does not include any specific functional limitations, so there is no reason to find that the ALJ failed to adequately account for a limitation identified by a professional.

After careful consideration, I agree with the Commissioner.

As an initial matter, an ALJ is not required to adopt the verbatim wording of an opined limitation in the RFC finding, even if the ALJ finds an opinion persuasive. *E.g.*, *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). But Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted"—1996 WL 374184, at *7 (July 2, 1996).

Here, Dr. Haaga opined that Ms. Costas's symptoms "will likely cause difficulties" and will make "many tasks significantly more difficult" when "the demands become too great." The ALJ found that opinion fully persuasive and limited Ms. Costas to work that does not require a fast production pace (like assembly line work) or work requiring hourly quotas. (Tr. 22.) The ALJ further found that Ms. Costas can deal with occasional changes in a routine work setting. (*Id.*)

Ms. Costas does not point to any material inaccuracy in the ALJ's recitation of the record evidence or the opinion evidence. She does not argue that the ALJ failed to discuss the relevant factors. She instead argues that Dr. Haaga provided for functional limitations that were (she says) inexplicably unaccounted for. But she does not identify what specific limitations she wished were included in the RFC. "[A] diagnosis alone is not enough to establish specific functional limitations as a matter of right." *E.g.*, *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

While Ms. Costas does not point to a specific opined functional limitation that was not included in the RFC, I further note that, reading the opinion as a whole, it is clear that the ALJ provided sufficient reasoning and cited substantial evidence for the limitations stemming from Dr. Haaga's opinions in the RFC. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021).

For instance, the ALJ explained his reasoning at Step Three, as follows:

> In understanding, remembering or applying information, the claimant has no limitation. The claimant testified that she obtained an associate's degree in nursing but she was unable to work as a nurse due to her physical problems. . . . . During a consultative examination, the claimant denied problems learning . . . .
>
> In interacting with others, the claimant has a mild limitation. She testified that she does not go out often and she has social anxiety when she goes out. It is not too bad with her family, but stressful when she has company. She tries to interact as little as possible and avoids going somewhere that she may run into anyone . . . . However, while undergoing a consultative examination in 2024, the claimant reported good relationships with two siblings and her children, as well as adequate relationships with teachers and peers . . . . .
>
> With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. She stated that she worries about money and has uncontrolled anxiety 4 days a week. The medication makes her fatigued and she falls asleep. Her symptoms increase with anxiety and she has intrusive thoughts that make it hard to focus. However, she stated that Adderall helps her to focus, and she is able to focus on one task at a time with medication.
>
> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant lives alone in a house owned by her parents. She does laundry and folds clothes after they come out of the dryer. She prepares her meals in the microwave and has her groceries delivered. She takes medication that makes her fatigued and she falls asleep.

(Tr. 20–21.)

Further, when discussing the RFC, the ALJ carefully and accurately summarized Ms. Costas's mental health complaints and her treatment history over the course of at least five pages.

(Tr. 22–26.) The ALJ noted her hospitalization, while also recognizing that she responded well to treatment. (Tr. 24.) The ALJ then traced her later treatment, noting that her anxiety and depressive symptoms improved with medication and treatment. (Tr. 25.) The ALJ identified those mental status examinations that were largely normal and noted that Ms. Costas herself often described herself as stable on medication. (*Id.*)

In light of the arguments presented, I find that Dr. Haaga's opinions are not inconsistent with the RFC, and any inconsistency that may exist was sufficiently explained in the ALJ's detailed reasoning and is supported by substantial evidence. Moreover, Ms. Costas does not proffer any medical opinion providing for a more restrictive RFC. Accordingly, I recommend that Ms. Costas's first assignment of error be overruled.

**1. Second Assignment of Error – Ms. Treharn's Medical Opinion**

In her second assignment of error, Ms. Costas contends that the ALJ failed to adequately address Ms. Treharn's opinion about her functional limitations. She says that the ALJ failed to adequately address the supportability and consistency factors before finding that opinion unpersuasive.

The ALJ addressed Ms. Treharn's opinion as follows:

> Lauren Treharn, completed a mental source statement from the Serenity Center on March 4, 2025, noting that the claimant had a good response to medication and was stable on medications. She indicated that the claimant had side effects of dizziness, drowsiness, fatigue, lethargy, nausea, stomach upset, headache, weakness and light headedness. Clinical findings were noted for a depressed mood, poor concentration, socially avoidant, sleep disturbance, anxious, avoidant, inattentiveness, and restless. However, her prognosis was good, stable as long as she continued treatment. She assessed that the claimant was in category III in all areas of mental abilities to do unskilled work which translated to precluding performance from 11% to 20% of an 8-hour workday. She opined that the claimant would be absent four days per month and job demands could exacerbate her symptoms . . . .
>
> . . .

> The undersigned does not find the opinion of Lauren Treharn, persuasive. Ms. Treharn assessed that the claimant was in category III in all areas of mental abilities to do unskilled work which translated to precluding performance from 11% to 20% of an 8-hour workday, and opined that the claimant would be absent four days per month as well as job demands could exacerbate her symptoms . . . . However, her opinion is not supported by her statements that her symptoms and conditions have a significant effect. Cognitive impairment of depression with slow thought, forgetful, ADHD, challenging remembering procedures or recalling them and anxiety causing racing thoughts, poor concentration and increasing stress leading to being overwhelmed. . . . However, progress notes at Serenity Center consistently describe the claimant as stable despite some symptoms of anxiety and depression on November 15, 2024. Cognitive function was intact as well as short-and long-term memory. . . . Her depressive symptoms were episodic and her anxiety was occasional. She denied suicidal ideation as well as problems with anger . . . . She had no apparent serious mental status abnormalities and neither depression nor mood elevation was evident. She denied suicidal ideation as well as homicidal intentions and her behavior was appropriate . . . .

(Tr. 28–29.)

The Commissioner defends this reasoning, noting that the ALJ addressed supportability in that he found the opinion unsupported by Ms. Treharn's own examination notes and that the ALJ addressed consistency in that he found the opinion inconsistent with other treatment records.

I again agree with the Commissioner.

As discussed above, the "supportability" factor looks to how well the medical source supports her opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

Here, the ALJ found that Ms. Treharn's opinion, which placed Ms. Costas in a disabling category in nearly every respect, was inconsistent with her own treatment notes showing stability

in Ms. Costas's symptoms. This is legally sufficient. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021), *report and recommendation adopted*, 2022 WL 627055 (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020) (holding that ALJ properly addressed supportability factor by noting that physician's opinion was unsupported by her own treatment notes).

And it is also factually accurate. When Ms. Treharn saw Ms. Costas in November 2024, for instance, Ms. Treharn noted that her anxiety was improved on medication. (Tr. 1026.) While anxiety and depressive symptoms were present and Ms. Costas reported panic attacks a "few times a month," Ms. Treharn on examination noted that Ms. Costas was friendly, attentive, and communicative, with normal and coherent speech. (Tr. 1026–28.) Ms. Treharn noted no gross abnormalities and, indeed, found signs only "of mild depression." (Tr. 1028.)

Ms. Costas calls the ALJ's analysis a "selective[] focus" highlighting only the supportive parts of the record, and she directs the Court to Ms. Costas's initial evaluation with Ms. Treharn in June 2021. (*See* Tr. 483.) But even in that treatment note, Ms. Costas's citations are to her own self-reported history, not Ms. Treharn's findings. Even then, Ms. Costas told Ms. Treharn at that appointment that she had not had recent panic attacks and described her depression as "episodic." (Tr. 484) Further, Ms. Treharn at that appointment noted that Ms. Costas's medication was largely "very effective" and, on examination, found Ms. Costas to be "calm, friendly, attentive, [and] communicative" with normal speech. (Tr. 487, 489.) There were "no signs of anxiety." (Tr. 489.)

Ms. Costas's citation to treatment notes in January and October 2022 fare no better, as Ms. Costas reported at those appointments that her medications were "working well" (Tr. 526) and Ms.

Treharn found no gross abnormalities on examination; Ms. Costas was euthymic with no signs of anxiety noted. (Tr. 527, 579.) While she had episodic anxiety and depression, she described her symptoms as "manageable." (Tr. 578.)

Ms. Costas points to treatment notes from November and December 2024, but in those notes she again describes her anxiety and depression as "episodic." (Tr. 1026–27, 1033.) And Ms. Treharn again found on examination that Ms. Costas had no gross abnormalities and actually presented as friendly, attentive, cooperative, and communicative with normal speech. (Tr. 1028.) With medication changes, her symptoms improved. (Tr. 1033.)

I find no error in the ALJ's discussion of supportability with respect to Ms. Treharn's opinion, and his conclusion with respect to that issue is supported by substantial evidence.

With respect to the consistency factor, it is true that the ALJ could have more clearly stated that he found the opinion inconsistent with the other medical evidence. But reading the opinion as a whole, the ALJ made clear that he found Ms. Treharn's opinion inconsistent with other evidence in the record. The ALJ carefully reviewed the record in this case with respect to Ms. Costas's mental health treatment (Tr. 24–27) and, immediately after discussing Ms. Treharn's opinion, the ALJ stated that Ms. Costas's psychological limitations were adequately accommodated by limiting her from fast production pace and to occasional changes in a routine work setting. (*See* Tr. 29.)

In any event, even if it were not clear, I agree with the Commissioner that any error with respect to the ALJ's consideration of the consistency factor would be harmless here because the ALJ already found the opinion to be unsupported by Ms. Treharn's own treatment notes. *See Ingram v. Comm'r of Soc. Sec.*, No. 1:20-cv-2692, 2022 WL 2237807, at *7 (N.D. Ohio June 22, 2022) ("Once the ALJ determines that a medical source opinion is unpersuasive as unsupported by the source's own examination findings and provides a coherent explanation for why, any failure to

also explain whether the source's opinion was consistent with other medical and nonmedical evidence is necessarily harmless.").

Further, I am convinced that the ALJ's conclusion with respect to Ms. Treharn's opinion is supported by substantial evidence. While Ms. Costas points to her September 2019 hospitalization, her intake examination for medication management, and parts of Dr. Haaga's examination, I find that the ALJ thoroughly discussed the treatment notes from each provider and other medical records and explained—with citations to those notes—that the record as a whole is inconsistent with greater limitations than those contained in the RFC. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("[I]t is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision.").

Here, I am convinced that the ALJ's conclusions with respect to Ms. Treharn's opinion are supported by substantial evidence and were adequately explained. Therefore, I recommend that the Court overrule Ms. Costas's second assignment of error.

As there is no basis to reverse or remand in this case, I recommend that the Commissioner's decision be affirmed.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: September 9, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).